MISSISSIPPI NURSING HOME, et al. *v.* SESSUMS

No. 43673 November 15, 1965 180 So. 2d 157

*Daniel, Coker & Horton,* Jackson, for appellants. ·

*Barney E. Eaton, III,* Jackson, for appellee.

LEE, C. J.

Mrs. Velma D. Sessums lived at Madison, Mississippi. She was a 55 year old woman, the mother of two children, and had been a housewife during her entire married life. On October 7, 1962, out of necessity, she accepted employment from Mississippi Nursing Home at an average weekly wage of $36.00. Her duties were to bathe and shave the patients, change their beds, and help those, needing help, to get out of bed. About March 12, 1963, as she was getting a patient out of the bathtub, she sustained a back sprain which caused pain and discomfort for several days and necessitated the taking of anacin for relief of pain. Subsequently, about 10:00 A.M. on March 26, 1963, she and another nurse had bathed and dressed a patient and were taking him from the bed to tie him in a chair. Suddenly his feet folded up and he went down. She sustained a strain and felt like everything in her was falling out. She reported the injury to the receptionist, and was bidden by the manager to see a doctor. She engaged a friend to drive her to Canton to see Dr. C. H. Heywood, her family physician, who examined her and advised her to undergo surgery. Upon her return home, she received a request from the Nursing Home to go to Dr. Williams the next day. She complied with that request and the doctor advised her to return in a week. However, at the suggestion of either her daughter or a friend, the next day

she went to Dr. Blanche Lockard, a gynecologist and obstetrician.

Dr. Lockard testified that she obtained a history of the two episodes, made an examination, and found that Mrs. Sessums had sustained a cystocele — a falling down of the bladder, and a rectocele — a bulging forward of the rectum through the lower part of the vagina. She also described the trouble as a third degree prolapse of the uterus — the most serious phase of that condition. The doctor advised surgery as the necessary treatment; and this she performed at St. Dominic's Hospital on April 10, 1963. Hospitalization lasted 10 days. Thereafter she saw Mrs. Sessums on several occasions in May, on July 29, and finally on October 9, 1963. In the final medical report, the doctor noted that the patient was unable to return to work, if required to lift patients or objects weighing more than 25 pounds.

Dr. Lockard further testified that Mrs. Sessums would never be able to lift a body or strain to move patients; that she could not return to her former or similar employment; that she was 100 percent disabled so far as that kind of employment was concerned; that the injury was responsible for 50 percent of her present disability; and that the other 50 percent disability was due to a pre-existing weakness. On cross-examination, she was of the opinion that the weakness had been corrected, or some of it, by surgery, and that Mrs. Sessums was better off physically insofar as that phase of her disability was concerned. However, she said that, statistically, Mrs. Sessums might lift heavy objects, but this could produce another prolapse — the percent of chances was always present after surgery, as no one ever repairs them 100 percent. Besides, she reiterated on redirect examination, that the patient had been disabled 100 percent to return to her former or similar employment; that 50 percent of her present disability was due to the injury; and that nothing which she had said on cross-examination should be construed to change that opinion.

Dr. C. H. Heywood had been Mrs. Sessum's family physician for many years. He had officiated at the birth of her second daughter more than 13 years before, and had examined and treated her from time to time over those years. He was the surgeon in his partnership firm of doctors, and had advised surgery when Mrs. Sessums came to him the day of the accident. He saw her again on February 21, 1964, at which time he thought that she had a partial recurrence of her cystocele; but it was not as bad as when he saw her previously. He saw her again on March 24 and April 2, 1964. The doctor concurred in the diagnosis of Dr. Lockard. Besides, he was also of the opinion that the condition was caused from the strain, attendant on the lifting of the patient; and that Mrs. Sessums should not do any heavy lifting again. He was also of the opinion that 50 percent of her present disability must be attributable to the accidental injury.

Since the injury, Mrs. Sessums has been able to work for only two weeks at the Old Men's Home. This began on the last day of October 1963, and she received $6.00 per day for that short period. Her work was to set up the medicine, give it out, carry tobacco, matches and mail to the patients, and dip their food in the trays.

The attorney-referee held that the claimant, from and after October 9, 1963, was entitled to no compensation benefits whatever. On review by the Commission, that action was affirmed. On appeal to the circuit court, the commission was reversed and a judgment was entered, fixing permanent partial disability benefits at $12.00 per week during the continuance of such disability, not to exceed 450 weeks.

The evidence by the claimant and her daughter showed that Mrs. Sessums sustained this strain and accidental injury in the course of her employment and while performing the duties thereof. This fact was not even denied. Medical evidence confirmed the nature and extent of the injury as resulting in total disability. Sur-

gery was necessary as the exclusive treatment for this injury, and two doctors had advised that course. The patient was dismissed by the operator on October 9, 1963, but with the distinct qualification that Mrs. Sessums was "unable to return to work if required to lift patients or objects weighing more than 25 lbs." Both doctors agreed that this claimant, at the time of the hearings, was unable to do the kind of work which she had been doing for the appellant, and that she had a disability of 50 percent, attributable to her previous weakness, and an existing disability of 50 percent, attributable to her accidental injury.

This claimant undoubtedly sustained a serious injury. Workmen's compensation was designed to take care of such eventualities. The only question, on this appeal, is whether the Court will sanction the disallowance of an award of compensation when that action rests on a strained and hypercritical construction of several answers by Dr. Lockard.

Dr. Lockard explained that the weakness had been corrected, or partly so, by surgery and that Mrs. Sessums was better off physically so far as that was concerned. This statement was undoubtedly the basis for the conclusion by the attorney-referee that the patient had fully recovered from the accidental injury. Yet, when her whole statement is considered, it is obvious and inescapable that the doctor was merely meaning to take some credit for the surgery which she had performed; but, at the same time, she was definitely of the opinion that Mrs. Sessums had a residual of 50 percent of her disability, attributable to the accidental injury. In other words, the Court is of the opion that the evidence of Dr. Lockard, when fairly analyzed and appraised, was not susceptible of the import which was given to it by the attorney-referee and which was subsequently approved by the Commission.

The rule in Central Electric Power Ass'n. v. Hicks, 236 Miss. 378, 388-89, 110 So. 2d 351, 356 (1959), is here applicable, namely:

"Certainly the legal affect (sic) of the evidence, and the ultimate conclusions drawn by an administrative tribunal from the facts, as distinguished from its findings of primary, evidentiary, or circumstantial facts, are questions of law, especially where the facts are undisputed or the overwhelming evidence reflects them."

This Court in Rathborne, Hair & Ridgeway Box Co. v. Green, 237 Miss. 588, 594, 115 So. 2d 674, 676 (1959), said:

"The rule in this State is that when a pre-existing disease or infirmity of an employee is aggravated, lighted up, or accelerated by a work-connected injury, or if the injury combines with the disease or infirmity to produce disability, the resulting disability is compensable. A corollary to the rule just stated is that when the effects of the injury have subsided, and the injury no longer combines with the disease or infirmity to produce disability, any subsequent disability attributable solely to the disease or informity is not compensable."

In the Rathborne case, *supra*, it appeared that, subsequent to the claimant's injury, the partial disability was not causally related to the injury; the effects had subsided; and the course of the disease was not changed by the injury or the surgery. Two doctors had so testified, and there was no medical proof to the contrary.

The opposite situation existed in the present case. Here, both doctors testified to the present disability of the claimant, with the respective attribution to both the pre-existing weakness and the accidental injury.

In addition to what has been said, this Court in M. T. Reed Construction Co. v. Garrett, 249 Miss. 892, 164 So. 2d 476 (1964), dealt with a case somewhat similar

to the present controversy. In that instance, all of the doctors agreed that the injury caused the disability, which followed, and that the claimant was still disabled. Like circumstances obtain in the present case. The Garrett case, *supra,* also pointed out that there is a distinction between medical and functional disability. Besides, the Court, in that case, applied the principles announced in the Hicks case, *supra.*

It therefore follows that the learned circuit judge was correct in reversing the order of the commission and awarding compensation in accordance with the law and the proven evidence.

The judgment of the circuit court is affirmed.

Affirmed and remanded to the Commission.

*Rodgers, Patterson, Inzer and Smith, JJ.,* concur.